UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

PETER PAPE and JONATHAN SCHENK,

                  Plaintiffs,

            v.

DIRCKSEN & TALLEYRAND INC., d/b/a THE
RIVER CAFÉ and LUKE VOSSEN,

                  Defendants.

-----------------------------------------------------------------

NOT FOR PUBLICATION

**MEMORANDUM & ORDER**
16-CV-05377 (MKB) (SJB)

MARGO K. BRODIE, United States District Judge:

      Plaintiffs Peter Pape and Jonathan Schenk commenced the above-captioned action on September 27, 2016 against Defendants Dircksen & Talleyrand Inc., doing business as the River Café (the "River Café") and Luke Vossen, asserting claims for hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and New York City Human Rights Law, N.Y. Admin. Code § 8-101 *et seq.* ("NYCHRL"). (Compl., Docket Entry No. 1.) Plaintiffs allege that during their employment at the River Café, Vossen sexually harassed them and then retaliated against them for complaining about this harassment, (*id.* ¶¶ 15–38), and that the River Café "failed to protect Plaintiffs from [this] harassment and retaliation," (*id.* ¶ 42). On August 17, 2018, Defendants moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking to dismiss both Plaintiffs' Title VII, NYSHRL and NYCHRL retaliation claims and Schenk's hostile work environment claim. (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry No. 33; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 35.) By Order dated October 18, 2018, the Court

referred Defendants' motion to Magistrate Judge Sanket J. Bulsara for a report and recommendation. (Order dated Oct. 18, 2018.)

By report and recommendation dated February 1, 2019, Judge Bulsara recommended that the Court grant in part and deny in part Defendant's motion for summary judgment (the "R&R"). (R&R 2, Docket Entry No. 47.) On February 13, 2019, Plaintiffs filed objections to the R&R, and on March 6, 2019, Defendants responded to Plaintiffs' objections. (Pls. Obj. to R&R ("Pls. Obj."), Docket Entry No. 48; Defs. Resp. to Pls. Objs. ("Defs. Resp."), Docket Entry No. 50.) For the reasons set forth below, and consistent with the R&R, the Court grants in part and denies in part Defendant's motion for partial summary judgment.

**I. Background**

    **a. Factual background**

The Court assumes familiarity with the underlying facts as detailed in the R&R and provides only a summary of the pertinent facts.

The River Café is a restaurant in Brooklyn, New York. (Defs. L. R. 56.1 Stmt. of Undisputed Material Facts ("Defs. 56.1") ¶ 1, Docket Entry No. 34; Pls. L. R. 56.1 Smt. of Undisputed Material Facts ("Pls. 56.1") ¶ 1, Docket Entry No. 36.) Vossen is responsible for overseeing the daily operations of the private dining room at the River Café, supervising the employees working in the private dining room, and making event sales. (Defs. 56.1 ¶ 9; Pls. 56.1 ¶ 9.) The private dining room is only open for special events, such as private parties and wedding receptions. (Defs. 56.1 ¶ 11; Pls. 56.1 ¶ 11.) As a result, most employees work part-time and are paid hourly, and the work schedule for employees who work in the private dining room varies depending on the scheduled events. (Defs. 56.1 ¶¶ 12, 41; Pls. 56.1 ¶¶ 12, 41; Decl. of Luke Vossen ("Vossen Decl.") ¶ 29, Docket Entry No. 39 ("The nature of the private events

business is that employees only work when the Restaurant is hired for an event. Accordingly, everyone works on a part-time basis and the vast majority of employees have other jobs, or, like Pape, attend school.").) Because the dining room schedule is irregular, Vossen regularly solicits the availability of the dining room employees. (Defs. 56.1 ¶ 42; Pls. 56.1 ¶ 42; Vossen Decl. ¶ 30 ("Since the work schedule is constantly changing, I have to solicit availability regularly.").)

### i. Pape's employment

The River Café hired Pape to work part-time as a private dining room service bartender on June 4, 2015. (Defs. 56.1 ¶ 35; Pls. 56.1 ¶ 35.) Pape was a full-time student at Pace University at the time he was hired. (Dep. of Peter Pape ("Pape Dep.") 33:6–10, annexed to Declaration of Alena Shautsova in Opp'n to Defs. Mot. ("Shautsova Decl.") as Ex. 1, Docket Entry No. 38-1; Defs. 56.1 ¶ 37; Pls. 56.1 ¶ 37.) At his deposition, Pape testified that Vossen would solicit availability of the employees who worked in the dining room "probably once a week" by sending an email to staff members with a schedule "put[ting] [each employee] on for the days that [he or she] had previously worked." (Pape Dep. 36:2–10.) Vossen would then "check in" to "make sure those times still worked," but "[t]here was no real set way to confirm or answer to his E-mails." (*Id.* at 36:2–10, 39:4–8.) Instead, communication between Vossen and dining room employees was "scattered," and occurred via text message, E-mail, or in person. (*Id.* at 39:4–8.)

### 1. Letter from Pape's lawyer

On or about December 8, 2015, Pape's lawyer sent a demand letter to the River Café. (Defs. 56.1 ¶ 66; Pls. 56.1 ¶ 66.) The letter states that "Pape has been subjected to a hostile work environment by his supervisor Luke Vossen who sexually harasses Mr. Pape, verbally and physically." (Letter dated Dec. 8, 2015 1, annexed to Vossen Decl. as Ex. 16, Docket Entry No.

39-16.) The letter states that Vossen "allowed himself to touch Mr. Pape's private parts; allowed himself to refer to Mr. Pape with expressions like 'You were hired only because of your looks,' 'can you sit on my lap so we will discuss the schedule,'" and that "the harassment is silently observed by other managers who are not doing anything to prevent Mr. Vossen from harassing young men." (*Id.*) The letter also claims that the "actions by [the] company and its supervisors were committed in violation of Federal, State, and City Civil Rights Codes as well as the United States Constitution." (*Id.*)

### 2. Pape's last three months at the River Café

Pape last worked at the River Café on December 12, 2015. (Defs. 56.1 ¶¶ 54, 55; Pls. 56.1 ¶¶ 54, 55.) In a sworn declaration, Vossen asserts that "[i]n the last three months of [Pape's] employment," *i.e.*, from October of 2015 to December of 2015, Vossen "contacted Pape for shifts . . . but Pape was mostly unavailable." (Vossen Decl. ¶¶ 28, 32.) On November 6, 2015, Vossen sent Pape a text message stating: "I never got your email address. This is getting old." (Defs. 56.1 ¶ 51; Pls. 56.1 ¶ 51.) On November 29, 2015, Vossen sent Pape an email stating: "I didn't hear back from you. Are you ok[ay] for Saturday 3:30pm?" (Defs. 56.1 ¶ 52; Pls. 56.1 ¶ 52.) Vossen states that in October of 2015, because of Pape's unavailability, Vossen "hired another service bartender, Max Druiz, so that [Vossen would have] bartender coverage for events moving forward." (Vossen Decl. ¶ 33.) Druiz "had more availability than Pape and was more responsive." (*Id.* ¶ 34.) "[O]n three occasions when both Pape and . . . Druiz were available to work — October 17, 24, and December 12 — [Vossen] scheduled Pape in a server slot instead of the bartender slot," and scheduled Druiz to work as a bartender. (*Id.* ¶ 35.) Vossen scheduled Pape's December 12, 2015 server shift before the River Café received the demand letter sent by Pape's attorney. (Defs. 56.1 ¶ 67; Pls. 56.1 ¶ 67.)

4

In his sworn statement, Pape asserts that in November of 2015, he was "mostly available," but that Vossen "stopped scheduling [him] as often as . . . before." (Decl. of Peter Pape ("Pape Decl.") ¶ 19, annexed to Shautsova Decl. as Ex. 6, Docket Entry No. 38-6.) At his deposition, Pape testified that December 12, 2015 was "the first time ever that [he] was put as a server," (Pape Dep. 68:21–22), and states in his declaration that Druiz had previously worked as a server, (Pape Decl. ¶ 21). At the beginning of his shift on December 12, 2015, Pape attempted to speak with Vossen "about why . . . this change happen[ed]," *i.e.*, why Pape was scheduled to work as a server instead of a bartender. (Pape Dep. 60:12–14.) However, Vossen "immediately just walked away," and "wouldn't look at [Pape] or talk to [him]." (*Id.* at 60:12–16; *see also* Pape Decl. ¶ 22 ("The first time I came to work after the letter was sent, I could sense the hostility by Vossen and [another manager]. They would not talk to me, would not look at me.").) Though Pape was scheduled to work on December 19, 2015, he called in sick and did not work on that day. (Defs. 56.1 ¶ 55; Pls. 56.1 ¶ 55.) During his "last week at the River Café," Pape "started talking with [his] roommates [and] figuring out if there [were] any [other] catering opportunit[ies]." (Pape Dep. 143:22–144:4.)

Vossen states that he did not schedule Pape to work at the end of December of 2015 or the beginning of January of 2016 because "Pape had told [Vossen] that [Pape] could not work New Year's Eve and then was going on vacation with his family until sometime in January [of] 2016." (Vossen Decl. ¶ 42.) Vossen "directed Pape to contact [him] upon his return to provide his new availability." (*Id.* ¶ 43.) "Pape, however, never contacted [Vossen] or anyone at the River Café again." (*Id.*)

Pape testified at his deposition that he "may have" told Vossen that he was going on vacation in December of 2015, that he has been to Florida "several times" with his family "for

5

Christmas and New Years," and that December of 2015 "could have been one of those times." (Pape Dep. 181:12–13, 182:19–24.) However, in his sworn declaration submitted in opposition to Defendants' motion for summary judgment, Pape states that he "never told Vossen or River Café that [he] would be on a vacation in December of 2015" and that "[o]nce [he] was hired, [he] never had to and was never instructed to reach out to Vossen to ask for shift work." (Pape Decl. ¶¶ 10, 25.) Instead, "[i]t would be Vossen who would tell [Pape] and others when the shifts were available." (*Id.* ¶ 10.)

Pape also testified at his deposition that after working at the River Café on December 12, 2015 and calling in sick on December 19, 2015, he was "taken off the schedule completely" and never "put back on the schedule." (Pape Dep. 56:25–57:5, 57:13–16.) Pape knew that he was "taken off the schedule" because he "wasn't sent a schedule" or "contacted by River Café at all" after December 19, 2015. (*Id.* at 59:6–13.) Pape "assumed that there was something up and that [he] . . . got let go" or "was fired," though he did not receive a formal notification of termination. (*Id.* at 143:5–11; 59:14–16.) Pape did not contact the River Café after he called in sick on December 19, 2015 because he "knew the reason that they were taking [him] off the schedule was because of the paper that [his] lawyer sent [to the River Café]." (*Id.* at 59:17–21.)

In a sworn declaration, Pape's former roommate, Alex Paterson, states that "[i]n the end of December, 2015, [Pape] complained to [Paterson] that after [Pape's] lawyer sent a letter to River Café, [Pape] stopped receiving work schedule[s] and was taken off the schedule. [Pape] also told [Paterson] that [Vossen] made [Pape] work as a server after th[e] letter" sent by Pape's attorney to the River Café. (Decl. of Alex Paterson ("Paterson Decl.") ¶ 12, annexed to Shautsova Decl. as Ex. 5, Docket Entry No. 38-5.)

### ii. Schenk's employment

The River Café hired Schenk to work as a private dining room server on October 15, 2015. (Defs. 56.1 ¶ 15; Pls. 56.1 ¶ 15.) Schenk worked eight shifts at the River Café before his termination on November 10, 2015. (Defs. 56.1 ¶ 16; Pls. 56.1 ¶ 16.)

Defendants contend that of Schenk's eight shifts, Schenk was "late for almost all of them." (Defs. 56.1 ¶ 17; Vossen Decl. ¶ 11.) Schenk testified at his deposition that he was late for approximately three shifts. (Dep. of Jonathan Schenk ("Schenk Dep.") 53:2–54:17, annexed to Shautsova Decl. as Ex. 2, Docket Entry No. 38-2.) On October 21, 2015, Vossen sent Schenk an email stating, "[y]ou have to be better with your schedule in the future, otherwise this won't work." (Defs. 56.1 ¶ 18; Pls. 56.1 ¶ 18.) Vossen states that on November 10, 2015, Schenk "arrived to work late with a white button-down shirt that had a visible yellowing around its collar," (Vossen Decl. ¶ 18), and that "[w]hen Vossen addressed [Schenk's] dirty shirt, Schenk acted in an unprofessional and insubordinate manner," (*id.* ¶ 19). Schenk testified that when he arrived at work on November 10, 2015, Vossen "from a distance" told Schenk that he shirt looked dirty, but that his shirt was "not dirty at all." (Schenk Dep. 54:25–55:10.) Vossen states that he "decided to terminate Schenk's employment" because of Schenk's "persistent lateness, the dirty uniform, and the unprofessional response to [Vossen's] questions about [Schenk's] shirt." (Vossen Decl. ¶ 20.)

### iii. Pape's allegations of discrimination

Pape alleges that shortly after he began working at the River Café, Vossen began sexually harassing him. (Pls. 56.1 ¶ 86.) On average, Vossen made three to six comments about Pape's body each day that he worked at the River Café. (Pape Dep. 83:7–9.) Vossen would often ask Pape to "prepare alcoholic beverages for him which he would consume during work hours," and

7

"especially after one or two drinks," Vossen would "just start rambling on," "spewing stuff out left and right," and "becoming physical and go to the next level." (Pls. 56.1 ¶¶ 85, 87; Pape Dep. 42:7–11.) Vossen would say "nice ass" or "thank God you are good looking because you are not qualified for this job" "nearly every day of work." (Pls. 56.1 ¶ 88.) Vossen also told Pape "[a]re you too stupid to be working here[?] [T]hank God for your good looks because you are definitely not qualified to do this." (*Id.* ¶ 87.) On one occasion, Vossen told Pape and another co-worker "I wish I could get both of you back to my apartment because I would make both of your asses bleed." (*Id.* ¶ 92; Pape Dep. 79:13–15.) Vossen "would always try to ask [Pape] to go out with [Vossen]" or "go on a date with him." (Pape Dep. 79:15–17.) On one occasion, Vossen told Pape "[w]hy don't you sit on my lap and I will help you to pay for those books. You do not have to keep working." (Pls. 56.1 ¶ 93.) Pape claims that if Vossen thought that Pape was wearing boxer briefs, he would say, "[i]t is a shame a young guy like you would wear boxers like that." (*Id.* ¶ 94.) Vossen once said to Pape: "[g]uys your age are not curious these days, kids are not open any more." (*Id.* ¶ 97.) Vossen would also say that he needed a certain "type of drink or liquor, and [Pape] would go on to the top shelf and grab that liquor and [Vossen] would walk up behind [Pape] and grab [his] butt." (Pape Dep. 79:19–23.) When Pape put the bottle down, Vossen would say, "we no longer need that, and walk back into his office." (*Id.* at 79:24–80:3.)

Vossen would "grab" Pape's cheeks, chest, butt, and hips, "rub against . . . Pape's butt," "touch [the] back of his legs," and "wink at [him]." (Pls. 56.1 ¶¶ 90, 94, 95; Pape Dep. 47:10–12, 78:13–20.) "Vossen would lure . . . Pape into his office and would harass him there: talk to him inappropriately [and] touch his private parts, including his penis." (Pls. 56.1 ¶ 96.) Pape "tried addressing these issues with . . . another manager, but [that manager] would sweep

everything under the rug." (*Id.* ¶ 98.) Vossen would "try to feed [Pape] food," and "try to put food in [his] mouth." (Pape Dep. 80:13–18.) On three or four occasions after Vossen and Pape met in Vossen's office, "when [Pape] would try to leave [Vossen] would start closing the door for [Pape] to stay in[side]," "pin [Pape] against the door" and "grab [his] inner legs and [his] penis and [his] butt." (*Id.* at 84:20–85:19.)

### iv. Schenk's allegations of discrimination

Schenk alleges that shortly after he began working at the River Café, Vossen began sexually harassing him. (Pls. 56.1 ¶ 69.) On one occasion, Schenk climbed a ladder to change a light bulb, and Vossen "placed his hand on Schenk's calf," and said, "you are so skinny, you got to eat more." (*Id.* ¶ 73.) Vossen also once said to Schenk, "I want to slap you in the face with that lamb bone, and you are all good looks, no brain . . . [y]ou know you want to . . . you have no idea what I could do to you." (*Id.*) On another occasion, Schenk was eating in the kitchen at the River Café, and Vossen "put together a little cracker" with cheese and honey on it and "put it in front of [Schenk's] face like [Vossen] was about to feed [Schenk], and [Vossen] said try this Schenky, and . . . put the food in [Schenk's] mouth." (Schenk Dep. 40:15–23.) Vossen then said: "[y]ou know you like it, you could put all kinds of things in there. You can put all kinds of things in that mouth." (*Id.* at 40:24–41:3.) In addition, Schenk testified that Vossen once "smacked [his] ass, [his] butt, and kind of like grabbed it a little," (*id.* at 43:5–9), and once said "[y]ou have no idea what I can do to you," (*id.* at 44:20–25).

### b. Report and recommendation

By report and recommendation dated February 1, 2019, Judge Bulsara recommended that the Court grant Defendants' motion as to both Plaintiffs' Title VII, NYSHRL and NYCHRL retaliation claims, and deny Defendants' motion as to Schenk's Title VII, NYSHRL and

9

NYCHRL hostile work environment claims. (R&R 49.) Judge Bulsara also recommended that Defendants' request that Schenk be precluded from testifying about the causation of his physical damages be denied without prejudice to renew. (*Id.*)

### i. Pape's retaliation claims

In addressing Pape's Title VII retaliation claim, Judge Bulsara explained that Defendants dispute two elements of Pape's retaliation claim: (1) whether he suffered an adverse employment action; and (2) whether he can establish pretext. (R&R 25.) Judge Bulsara found that Pape suffered an adverse employment action when he was assigned to work as a server, rather than a bartender, (*id.* at 27–28), but did not suffer an adverse employment action when his relationship with Defendants came to an end because Pape failed to show that he was terminated, (*id.* at 28–31). Judge Bulsara concluded that "a reasonable jury could not reach the conclusion that Pape — having never called, texted, or communicated with anyone at the River Café to ask for more shifts, inquire about his job status, or express his desire to work — was fired." (*Id.* at 31.)

As to causation, Judge Bulsara found that Pape could not establish a connection between his alleged demotion and his protected activity because his demotion "preceded the [letter that Pape's attorney sent to the River Café] and therefore could not be causally connected to this protected activity." (*Id.* at 31–32.) Judge Bulsara also found that, assuming Pape's termination constitutes an adverse employment action, he could not establish causation as to his termination because his termination "is never pegged to any date" — "Pape has not identified a particular date on which he was scheduled to work, expected to receive a schedule from Vossen, or concluded that he was terminated." (*Id.* at 32.)

"Even assuming that Pape could put forth a prima facie case based on termination or demotion to server," Judge Bulsara found that Pape's retaliation claim would still fail because

10

Defendants offered legitimate nonretaliatory reasons for Pape's demotion and termination and Pape failed to show pretext. (*Id.* at 33–35.)

Finally, Judge Bulsara explained that NYSHRL and NYCHRL claims are analyzed under the same burden-shifting framework as Title VII claims, and found that Pape's failure to show pretext "dooms [his] NYSHRL and NYCHRL retaliation claims." (*Id.* at 35.)

### ii. Schenk's claims

Judge Bulsara found that, while a "very close question," Schenk's hostile work environment claim survives summary judgment. (*Id.* at 38.) Judge Bulsara concluded that, although Schenk's tenure at the River Café was short, a reasonably jury could conclude that Schenk was subjected to a hostile work environment because "he endured comments about his appearance, physical touching, and sexually-laden comments," (*id.*), and because "Vossen is alleged to have made not just Schenk's environment hostile, but also Pape's," (*id.* at 41).

As to Schenk's retaliation claims, Judge Bulsara found that Schenk failed to establish a prima facie case of retaliation and failed to show pretext. (*Id.* at 42.) First, Judge Bulsara found that "the record is insufficient to establish that Schenk engaged in [any] protected activity." (*Id.*) Second, Judge Bulsara concluded that even if Schenk could establish a protected activity, he could not show the necessary causal connection between that activity and his termination. (*Id.* at 45.)

Based on the foregoing, Judge Bulsara concluded that Schenk's retaliation claims under NYSHRL and NYCHRL did not survive summary judgment, but that his hostile work environment claims under these statutes did survive. (*Id.* at 47–49.)

### c. Plaintiffs' objections

Plaintiffs object to Judge Bulsara's recommendations only as to Pape's retaliation claim.

11

(Pls. Obj. 1.) Plaintiffs object to the conclusion that (1) Pape was not fired and therefore did not suffer an adverse employment action arising out of the termination of his relationship with the River Café; and (2) even if Pape was terminated and therefore suffered an adverse employment action, he has not shown a causal connection between that action and his protected activity. (*Id.*)

Plaintiffs argue that Pape can establish an adverse employment action arising out of his termination because "the evidence . . . show[s] that the month of December is the busiest month for catering," and therefore Vossen would have presumably reached out to Pape to schedule him to work unless Pape had been terminated. (*Id.* at 3.) Plaintiffs also argue that "Defendants' explanation that Vossen did not call Pape because Pape informed him of his vacation plans is not plausible and is denied by Pape in his declaration." (*Id.*)

As to causation, Plaintiffs argue that Pape has demonstrated a causal connection between his protected activity and his termination because "Vossen admitted that he was aware of the letter [that Pape's attorney sent to the River Café]." (*Id.* at 2.)

Defendants argue that Pape has failed to establish that he was terminated; "just because December usually has a lot of events . . . does not mean that back in December of 2015, Pape knew how far in advance the December schedule had been created or would have known, without the benefit of a schedule, which events he should have worked." (Defs. Resp. 2.) In addition, Defendants explain that, although Pape stated in his declaration that he did not go on vacation in December of 2015, he admitted at his deposition that he "may have told [Vossen] he was going on vacation," and that "several times [he has] been to Florida with [his] family for Christmas and New Years." (*Id.*) Defendants argue that Pape cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts his deposition testimony. (*Id.*)

12

As to causation, Defendants argue that Judge Bulsara correctly determined that, while Vossen admits that he at some point became aware of the letter that Pape's attorney sent to the River Café, there is no evidence that Vossen knew about the letter at the time he took any adverse employment action against Pape. (*Id.* at 3.)

## II. Discussion

### a. Standards of review

#### i. Report and recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1 (E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only conclusory or general objections. *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016) (holding that "general objection[s] [are] insufficient to obtain *de novo* review by [a] district court" (citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file *specific written objections* to the [magistrate judge's] proposed findings and recommendations." (emphasis added)); *see also Colvin v. Berryhill*, 734 F. App'x 756, 758, (2d Cir. 2018) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d

13

758, 766 (2d Cir. 2002))).

### ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Unopposed recommendations

No party objects to Judge Bulsara's recommendation that the Court (1) grant Defendants' motion as to Schenk's retaliation claims, (2) grant Defendants' motion as to Pape's retaliation claims based on his demotion, (3) deny Defendants' motion as to Schenk's hostile work environment claims, and (4) deny Defendants' request that Schenk be precluded from testifying about the causation of his physical damages without prejudice to renewal. (*See* R&R 49.) In addition, no party objects to Judge Bulsara's conclusion that Pape's failure to establish a Title

VII retaliation claim based on his demotion "dooms [his] NYSHRL and NYCHRL retaliation claims." (*Id.* at 35.)

The Court has reviewed the unopposed portion of the R&R and, finding no clear error, adopts these recommendations pursuant to 28 U.S.C. § 636(b)(1). Accordingly, the Court grants Defendants' motion as to Schenk's retaliation claims and Pape's retaliation claims based on his demotion, denies Defendants' motion as to Schenk's hostile work environment claims, and denies Defendants' request that Schenk be precluded from testifying about the causation of his physical damages without prejudice to renewal.

### c. Pape's Title VII retaliation claim based on his termination

Title VII retaliation claims are "evaluate[d] . . . using the three-step framework outlined in *McDonnell Douglas*." *Russell v. N.Y. Univ.*, 739 F. App'x 28, 32 (2d Cir. 2018) (citing *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018)). Under the framework, the plaintiff must first establish "a *prima facie* case of retaliation." *Id.* (quoting *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)). If the plaintiff sustains this initial "*de miminis*" burden, *Duplan*, 888 F.3d at 626, a "presumption of retaliation" arises and the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Saji v. Nassau Univ. Med. Ctr.*, 724 F. App'x 11, 14 (2d Cir. 2018) (quoting *Hicks*, 593 F.3d at 164). "If the defendant does so, then the burden shifts back to the plaintiff . . . [to] show that the reason offered by the employer is merely pretext, and that the employer's 'desire to retaliate' was the actual 'but-for cause of the challenged employment action.'" *Id.* (quoting *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015)). "'But-for' causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Duplan*, 888 F.3d at

15

625 (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015)).

### i. Prima facie case

To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Russell*, 739 F. App'x at 32 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

The parties only dispute the second and fourth elements — whether Defendants terminated Pape's employment and, if they did terminate his employment, whether Pape has established a causal connection between the protected activity (the December 8, 2015 letter from his lawyer to the River Café) and his termination.

### 1. Adverse employment action

Plaintiffs argue that a reasonable jury "could find that it was reasonable for Pape to conclude he was terminated when after [the River Café received Pape's] attorney's letter[,] . . . Vossen refused to discuss [the] changed schedule with him; [another manager] did not answer any of his questions[;] and Pape stopped receiving requests for availability [during] the busiest time of the year in [the] catering business." (Pls. Obj. 3–4.)

Defendants argue that Plaintiffs cannot show that Pape was terminated because "there is undisputed material evidence in the record that Pape abandoned his job": (1) the "decrease in number of shifts taken over the last three months of [Pape's] employment"; (2) Pape's admissions that he "mostly stopped texting [Vossen] once he hired his attorney" and "started looking for other jobs in December [of 2015]"; (3) "Pape's statement to Mr. Vossen that he could not work New Year's Eve and then was going on vacation with his family"; and (4)

Vossen's direction to "contact him upon return to provide his availability and Pape's failure to do so." (Defs. Resp. 1.)

In contrast to discrimination claims, an adverse employment action in a retaliation claim is one that a reasonable employee would find materially adverse, meaning it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (same). The scope of actions that may be materially adverse is thus broader for purposes of retaliation claims than for discrimination claims. *See Hicks*, 593 F.3d at 165 (citing *Burlington*, 548 U.S. at 67). In evaluating whether an action is materially adverse, "'[c]ontext matters,' as some actions may take on more or less significance depending on the context." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (citation omitted); *see also Hicks*, 593 F.3d at 165 (noting that even minor acts that would be immaterial in some situations may be material in others).

Termination is an adverse employment action. *See Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (noting that "typical examples of actionable adverse employment actions include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities'" (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000))); *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (finding that the plaintiff "suffered an adverse employment action when he was fired").

Drawing all inferences in Pape's favor, he has not raised a triable issue of fact as to whether he was terminated. According to Pape, he was "mostly available" in November of 2015

but Vossen "stopped scheduling [him] as often as . . . before." (Pape Decl. ¶ 19.) However, Pape worked on December 12, 2015 and was scheduled to work on December 19, 2015 but called in sick. (Defs. 56.1 ¶¶ 54, 55; Pls. 56.1 ¶¶ 54, 55.) In addition, Pape testified that he "may have" told Vossen that he was going on vacation in December of 2015, that he has been to Florida "several times" with his family "for Christmas and New Years," and that December of 2015 "could have been one of those times." (Pape Dep. 181:12–13, 182:19–24.) After calling in sick on December 19, 2015, Pape never contacted the River Café. (*Id.* at 59:17–21.) Instead, during his "last week at the River Café," he "started talking with [his] roommates [and] figuring out if there [were] any [other] catering opportunit[ies]." (*Id.* at 143:22–144:4.) Under these circumstances, Pape cannot point to any action of Vossen or anyone else at the River Café that "could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Vega*, 801 F.3d at 90 (quoting *Burlington*, 548 U.S. at 57) — in fact, he fails to point to any action undertaken by Vossen or the River Café. Pape therefore fails to establish an adverse employment action arising out of the termination of his relationship with Defendants.

Pape's testimony that, in the ordinary course, Vossen would solicit availability of employees who worked in the dining room, does not create a triable issue of fact as to whether he was terminated. (Pape Dep. 36:2–10.) Despite the general practice of Vossen reaching out to employees for availability, based on the facts of this case — Pape calling in sick for his last scheduled shift on December 19, 2015, Pape looking for other work opportunities, Pape possibly having told his employer that he was going on vacation for the holidays, and Pape never contacting Vossen or anyone else at the River Café after calling in sick — no reasonable jury could conclude that Defendants terminated Pape's employment; the evidence demonstrates that Pape abandoned his job, and therefore did not suffer an adverse employment action. *See, e.g.*,

*Kearse v. ATC Healthcare Servs.*, No. 12-CV-233, 2014 WL 958738, at *6 (S.D.N.Y. Mar. 11, 2014) (finding that the plaintiff did not suffer an adverse employment action because the evidence revealed that the plaintiff "effectively resigned" after he turned in his parking permit, left work in the middle of the day, and did not contact his supervisors or return to work until the following week); *Cadet v. Deutsche Bank Sec. Inc.*, No. 11-CV-7964, 2013 WL 3090690, at *11 (S.D.N.Y. June 18, 2013) ("A voluntary resignation does not constitute an adverse employment action unless the plaintiff was constructively discharged — *i.e.*, the resignation was in fact involuntary as a result of coercion or duress." (emphasis omitted)); *Barnes v. CCH Corp. Sys.*, No. 01-CV-2575, 2004 WL 1516791, at *5 (S.D.N.Y. July 7, 2004) (finding that the plaintiff "did not suffer an adverse employment action, because he, himself, quit his position . . . by refusing to continue at his job and leaving his employment").[1]

Pape has therefore failed to establish an adverse employment based on the severing of his relationship with Defendants and thus cannot establish a Title VII retaliation claim.

---

[1] The Court also finds unpersuasive Plaintiffs' argument that Vossen's refusal to discuss schedule changes with Pape and another manager's refusal to answer Pape's questions support the conclusion that Pape was terminated. Pape does not allege that he was constructively discharged, *i.e.*, that Defendants "intentionally create[d] a work atmosphere so intolerable that [Pape was] forced to quit involuntarily." *See Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003).

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion as to both Plaintiffs' Title VII, NYSHRL and NYCHRL retaliation claims, and denies Defendants' motion as to Schenk's Title VII, NYSHRL and NYCHRL hostile work environment claims.  The Court also denies without prejudice to renew Defendants' request that Schenk be precluded from testifying about the causation of his physical damages.

Dated: March 31, 2019
       Brooklyn, New York

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge